**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> KEVIN McMANAMAN, <br><br> Defendant. | No. CR10-4024-MWB <br><br> **AMENDED**[1] <br> **REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On May 21, 2010, the grand jury returned an eight-count Indictment charging the defendant Kevin McManaman with sexual exploitation of children, transportation of child pornography, and possession of child pornography, in violation of 18 U.S.C. §§2251(a) and (e), 2252A(a)(1) and (b)(1), and 2252A(a)(5)(B) and (b)(2). Doc. No. 2. On July 23, 2010, McManaman filed a motion to suppress evidence. Doc. No. 14. The plaintiff (the "Government") filed a resistance on August 2, 2010. Doc. No. 16. Pursuant to the Trial Management Order, Doc. No. 6, the court held an evidentiary hearing on the motion on August 17, 2010. Assistant U.S. Attorney Mark Tremmel appeared on behalf of the Government. McManaman appeared with his attorneys, Stan Munger and Jay Denne.

The Government offered the testimony of ATF Special Agent Todd Monney. McManaman testified in his own behalf, and he also offered the testimony of his wife, Tina Frye. The following exhibits were admitted into evidence, to-wit: **Gov't Exs. 1-7** - photographs of a closet and its contents in McManaman's residence; **Gov't Ex. 14** - photocopy of the outside of a VHS tape (admitted under seal); **Gov't Exs. 15 & 16** - photographs of the VHS tape depicted in Gov't Ex. 14; **Gov't Ex. 17** - a CD containing two audio recordings, one of McManaman's interview by officers on April 2, 2008, and the other of a second search of McManaman's residence on April 3, 2008; **Gov't Ex. 19** -

---

[1] The Amendment corrects the dates for the parties' objections.

transcript of suppression hearing of May 30, 2008, in CR08-4025-MWB; **Gov't Exs. 20-25** - photographs taken from McManaman's closet (admitted under seal).

Notably, this is the second time the court has considered a motion to suppress in connection with McManaman's arrest. In a prior case, bearing case number CR08-4025-MWB (the "prior case"), McManaman was charged with drug and firearm offenses. *See* Doc. No. 3 in the prior case. McManaman moved to suppress statements he made shortly following his arrest, and a shotgun that was found during a warrantless search of his residence. The undersigned held an evidentiary hearing on the motion and issued a Report and Recommendation containing the following factual background:

> Sometime before September 2005, law enforcement officers received information that McManaman was involved in trading firearms for drugs. An Amber Christianson told officers she had asked McManaman if he had any guns, and McManaman responded he had two guns in his house that he wanted to get rid of because he was a convicted felon. He told Amber he wanted to exchange the guns for some methamphetamine. When he delivered the guns to Amber, he told her he had gotten the guns from Justin Watterson, who had stolen them from Watterson's grandfather's home. McManaman also told Amber he was with Watterson when the guns were stolen.
> Officers interviewed McManaman on or about September 29, 2005, and he signed an affidavit in which he admitted he was a convicted felon and he was in possession of some firearms. Officers interviewed McManaman again on or about November 7, 2005, and at that time, he admitted that he had traded a gun for some drugs. He also told the officers he had disposed of a couple more firearms since his September 2005 interview. Later, officers talked with McManaman again, but the record does not indicate when or how many times. The last contact officers had with McManaman before his indictment on the current charges (which occurred on March 25, 2008) was on May 18, 2006.
> On April 2, 2008, about a week after McManaman was indicted, Agents Monney and Dodds met with officers from several other agencies for a briefing in preparation for

McManaman's arrest on the federal arrest warrant issued in connection with his indictment. Officers involved in the briefing included two agents from Immigration and Customs Enforcement, Deputy U.S. Marshal Peter Zellmer, and three officers from the Sioux City Police Department, one of whom was an officer with the Gang Unit. Agent Dodds testified McManaman was not suspected of any gang-related activities or immigration violations, and all of the officers present besides himself and Agent Monney were present for purposes of officer safety. Dodds acknowledged that McManaman had never been threatening or caused problems when officers had spoken with him previously, but the officers were aware that McManaman had a "history of violence" and numerous prior convictions, one of which was a "hate crime."

The officers proceeded to McManaman's residence at approximately 9:00 p.m. on April 2, 2008. They drove past the house but it appeared no one was home. They placed the house under surveillance and headed toward McManaman's mother's residence, thinking he might be there, but before they arrived, the officer watching McManaman's residence called to say McManaman had returned to his residence.

The officers returned to the McManaman residence and took up positions surrounding the house, covering all available exits. Agents Monney and Dodds approached the front door with Deputy Marshal Zellmer and a "breaching tool," which they planned to use if the home's occupants refused to open the door. Agent Monney knocked on the door and McManaman came to the door. When McManaman opened the door, the officers on the porch could see that there were several children in the house, appearing to range in age from a toddler to a teenager. They also could see a great deal of trash in the house and "stuff everywhere." McManaman's wife, Tina Frye, also came to the door.

Agent Monney asked McManaman if he would step out onto the porch. The officers wanted to avoid placing McManaman under arrest in front of the children, if possible. McManaman complied, and Frye stepped into the doorway. Monney informed McManaman that he had been indicted and they had a warrant for his arrest. He went behind McManaman and began patting him down for weapons.

3

During the pat-down, Monney found a marijuana pipe, a methamphetamine pipe, and a "snort tube" in McManaman's pockets.

The witnesses' hearing testimony differs on the events that occurred on the porch. Agent Dodds testified that while McManaman was being handcuffed, Dodds asked him if there was anything illegal inside the home that the officers should be concerned about. Dodds testified it is his experience that when people are carrying drug paraphernalia, they are likely to have drugs nearby. Based on McManaman's history, they also feared there might be firearms in the house. According to Dodds, McManaman responded to the question by pausing briefly, sighing, and then stating there was a broken-down shotgun in his basement that had belonged to his grandfather. McManaman asked the officers if Frye could retrieve the shotgun, but the officers stated one of them would have to accompany Frye into the house to get the firearm. McManaman told Frye where the shotgun was located. Frye came out on the porch, closed the front door, and then led Dodds around to a door at the back of the house. She opened the door and led Dodds and another officer to the basement, where they retrieved the shotgun.

McManaman first testified that when Dodds asked him the question about whether there was anything illegal in the house, he paused briefly, and then stated there was a shotgun in the basement. He told the officers that the shotgun was broken down into pieces and stored where his children could not get to it. He asked if his wife could retrieve the gun, and, according to McManaman, one of the officers told him they either could send one officer into the house with Frye to retrieve the shotgun, or they would have to bring in a dog and search the house. Later, he changed his testimony, and stated that the officer's comment about bringing in a dog to search the house came earlier in the events. In this version, after Dodds asked McManaman the question about whether there was anything illegal in the house, McManaman paused briefly, but before he could answer further, either Monney or Dodds stated if he did not cooperate and tell them about anything illegal that was in the house, they would send a dog through the house. McManaman also testified that as he was being

patted down and handcuffed, one of the officers on the porch asked him, "Where's the meth?" Agents Monney and Dodds both testified on rebuttal that no statements were made during McManaman's arrest concerning bringing a dog into the house. Deputy Marshal Zellmer, who also was on the porch during the arrest, testified he did not hear any statements about a dog.

The officers and McManaman agree that after McManaman stated there was a firearm in the house, Frye led Dodds around the house, opened the door, and Dodds and another officer followed her to the basement to retrieve the firearm. The entire exchange, from the time McManaman was taken into custody until his wife led Dodds around the side of the house, took no more than five minutes. The parties also agree that after his arrest, McManaman was taken to the Woodbury County jail, where he was advised of his rights and then questioned in detail about the allegations in the indictment. During this questioning, he made certain admissions.

Substantial additional testimony was elicited at the hearing concerning whether, and when, Frye may have consented to a search of the residence; what other actions officers took inside the residence when they went in to retrieve the shotgun; and what officers discovered in a subsequent search of the residence. None of these facts are relevant to consideration of McManaman's current motion to suppress.

Doc. No. 39 in the prior case, pp. 2-5.

After considering the evidence, the undersigned recommended that McManaman's motion to suppress in the prior case be granted in part and denied in part. Specifically, the undersigned found that McManaman's statements to officers immediately following his arrest, but before *Miranda* warnings were administered, were in response to questioning that violated McManaman's Sixth Amendment right to counsel. The undersigned further found that the shotgun seized by officers from McManaman's home did not need to be suppressed because it inevitably would have been discovered. At the time of McManaman's arrest, a pat-down search of his person yielded a marijuana pipe, a

methamphetamine pipe, and a "snort tube." The undersigned found that this evidence, together with McManaman's criminal history and his prior admissions about possessing firearms, would have provided probable cause for a warrant to search the residence, during which the shotgun inevitably would have been discovered. Judge Mark W. Bennett accepted the undersigned's Report and Recommendation, and denied McManaman's motion to suppress. *See* Doc. No. 46 in the prior case.

In the present motion, McManaman again argues officers' entry into his home was unlawful, and any evidence discovered while the officers were in his home should be suppressed. He further argues all evidence from a subsequent search later that evening, and his post-arrest statements regarding the alleged child pornography, should be suppressed as fruit of the poisonous tree. He argues no one consented to the officers' search of the residence, either immediately following his arrest or later that night, or alternatively, even if Frye did consent, she lacked the authority to do so, and therefore the searches violated his Fourth Amendment rights. Doc. No. 14-1.

McManaman notes that in denying his motion to suppress in the prior case, Judge Bennett found that the question of whether the shotgun inevitably would have been discovered was "an exceedingly close question." *See* Doc. No. 46 in the prior case, p. 14. Nevertheless, Judge Bennett held that probable cause existed and "a neutral magistrate would have issued a search warrant for [McManaman's] home." *Id.* McManaman argues the court should reverse this ruling, and find probable cause did not exist to support a search warrant. He further argues that even if there was probable cause for issuance of a search warrant, "the facts surrounding the seizure of the alleged child pornography are sufficiently different tha[n] the seizure of the shotgun that the inevitable discovery rule does not apply to this case." Doc. No. 14-1, p. 8.

Because it appeared, at first blush, that McManaman would be collaterally estopped from rearguing the issues of whether probable cause existed such that a search warrant could have been obtained, and whether the officers inevitably would have discovered the

6

shotgun, the court directed the parties to file briefs on the collateral estoppel issue. In McManaman's brief, Doc. No. 22, he argues collateral estoppel should not apply against criminal defendants. He acknowledges that the Eighth Circuit Court of Appeals has held otherwise, *see* Doc. No. 22, p. 2 (citing *United States v. Rosenberger*, 872 F.2d 240, 242 (8th Cir. 1989)), but he relies on more recent cases from other jurisdictions that have held application of the collateral estoppel rule against criminal defendants may violate due process. Doc. No. 22, p. 2 (citing *United States v. Martin*, 169 F. Supp. 2d 558 (E.D. La. 2001); *United States v. Harnage*, 976 F.2d 633(11th Cir. 1992)). McManaman further argues that even if collateral estoppel applies against him in this case, it would only go to the Government's inevitable discovery of the shotgun, not the alleged child pornography. *Id*.

"The doctrine of collateral estoppel, also known as issue preclusion, provides that 'when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in another lawsuit.'" *Chavez v. Weber*, 497 F.3d 796, 803 (8th Cir. 2007) (quoting *United States v. Brekke*, 97 F.3d 1043, 1049 (8th Cir. 1996)). The Eighth Circuit Court of Appeals has explained that the doctrine of collateral estoppel applies when:

> . . . (1) the issue sought to be precluded is identical to the issue previously decided; (2) the prior action resulted in a final adjudication on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action. *Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1168 (8th Cir. 1989) citing *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 356 (8th Cir. 1984), *cert. denied*, 469 U.S. 1158, 105 S. Ct. 906, 83 L. Ed. 2d 920 (1985)).

*Ripplin Shoals Land Co., LLC v. U.S. Army Corps of Engineers*, 440 F.3d 1038, 1044 (8th Cir. 2006); *accord Barzilay v. Barzilay*, 600 F.3d 912, 920 (8th Cir. 2010).

The rule of collateral estoppel applies in criminal cases as well as civil cases, although in criminal cases, the rule "'is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality[.]'" *Untied States v. Torres-Villalobos*, 487 F.3d 607, 617 (8th Cir. 2007) (quoting *Hernandez-Uribe v. United States*, 515 F.2d 20, 22 (8th Cir. 1975)).

In the prior case, McManaman had a full and fair hearing and opportunity to litigate the issues of whether the Government would have sought, and a neutral magistrate would have issued, a search warrant based on probable cause, and whether the shotgun inevitably would have been discovered during execution of such a warrant. His motion to suppress in the prior case resulted in a ruling on the merits on those issues. The court finds McManaman is estopped from relitigating the issues of probable cause and inevitable discovery *of the shotgun*. However, the court further finds the issue of inevitable discovery of the alleged child pornography has not been litigated, and McManaman has raised the issue properly in his current motion to suppress in the present case. Accordingly, the court will set out the additional facts relating to discovery of the alleged child pornography.

Agent Zane Dodds entered the residence following McManaman's arrest to retrieve the shotgun. As Tina Frye led him through the house, they encountered a locked door. Dodds claims Frye consented to the officers' search of the locked room. According to Dodds, Frye stated the door must have been locked accidentally and they usually used a screwdriver to get into the room. Another agent who was present with Dodds and Frye had a pocket knife, and using the knife, Frye quickly opened the locked door. Doc. No. 30-1, p. 74; Gov't Ex. 19, pp. 116-17. Dodds did not search the room himself; instead, Monney entered the residence to look inside the room. *Id.*, p. 117. Inside the locked room, Monney encountered a closet that was locked with a padlock. According to Monney, Frye stated she did not have a key to the padlock, but she gave him permission to open the closet door. Monney removed the door's hinge pins to open the door. Doc.

No. 30-1, p. 6. Frye denies that she consented to any search of the residence. Gov't Ex. 19, pp. 92, 95-96, 101.

When the closet door was removed, Monney observed some boxes, stacks of magazines, and videotapes. *See, e.g.*, Gov't Exs. 2 & 3, photographs of the interior of the closet.[2] Monney proceeded to look through the closet's contents, including opening boxes and rifling through a stack of magazines. Inside one box, mixed in among some magazines, Monney found several color photographs depicting young nude females. The photographs bore text at the bottom that appeared to be an Internet address. *See* Gov't Exs. 20-25. Defense counsel objected to Monney's characterization of the individuals in the photographs as "young." The court found at the hearing that "after viewing those pictures, [the officers] were reasonable in believing that they had observed child pornography . . . and, if it came into their plain view, that that would justify their further investigation of that issue." Doc. No. 30-1, pp. 76-77. At least four of the individuals in the photographs appear to be underage. *See* Gov't Exs. 20-23.

Monney also found a videotape bearing a handwritten label on which was written a name that Monney knew to be the same as McManaman's minor daughter's name, followed by "Home XXX Edit," and a date. *See* Gov't Ex. 14. Monney testified that when he asked Frye about the items in the closet, Frye "said that she knew that there were some pornographic material in the closet," and she asked him "to get rid of it all . . . to take it." Doc. No. 30-1, p. 30. Monney removed the videotapes and printed materials from the closet. Officers later questioned McManaman about the materials, and he made certain admissions regarding the materials.

Frye testified at both of the suppression hearings. She denied that she gave consent to the officers to do anything other than accompany her into the house to retrieve the shotgun, and she further stated she never explicitly gave them permission even to do that;

---

[2] Monney testified that the photographs of the closet's interior were taken prior to anyone touching any items in the closet.

9

rather, they followed her into the house when she entered to retrieve the shotgun. *See* Gov't Ex. 19, pp. 92, 95-96. She stated that after the items were removed from the closet, the officers presented her with both a consent-to-search form and a form authorizing them to take the videotapes, but she refused to sign either form, and stated she had never consented to their search of the house. Gov't Ex. 19, pp. 95-96, 124-25. Dodds testified that Frye led him through the house, and each time they passed a room, he asked if he could look into it and she consented. Gov't Ex. 19, pp. 116-18. Monney testified that Frye never objected as she led agents through the house or during the search, and she gave him permission to open the locked closet. Doc. No. 30-1, pp. 6-7, 32. After Monney discovered the pornographic material and alleged child pornography in the closet, Frye asked him to remove the pornographic materials from the residence. *Id.*, p. 30; *see id.*, p. 31.

McManaman argues the officers would not have found the alleged child pornography during any search pursuant to a warrant. He argues the photographs were not in plain view and they would not have been found during a search for drugs, paraphernalia, and guns. He elicited testimony from Monney regarding the fact that the six photographs appeared to have been folded into fourths, with the photograph on the inside. Although Monney could not remember specifically whether the photographs were folded when he first encountered them, he did not believe they were because he recalled the photographs being "face up" when he saw them among the magazines. Doc. No. 30-1, pp. 54-57.

McManaman further claims the incriminating character of the items was not immediately apparent because "[v]ideotapes, DVDs, and video cameras are not illegal. Pornographic magazines are not illegal. The only way the officers determined their alleged illegality was by manipulating the items and moving them around. . . . The police had no probable cause to believe McManaman was in any way tied to child pornography, so the mere appearance of these videotapes and pornographic magazines would not have

10

given them cause to search further." Doc. No. 14-1, pp. 10-1 (citing *United States v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987) "(officer's actions in moving equipment to locate serial numbers constituted a 'search' which had to be supported by probable cause, notwithstanding that the officer was lawfully present in the apartment where the equipment was located)").

The Government argues that a search warrant authorizing a search for drugs would allow officers to search "all areas and containers in which the object of the search may be found." Doc. No. 16-1, p. 1 (quoting *United States v. Nichols*, 344 F.3d 793, 798 (8th Cir. 2003)). The Government relies on *United States v. Evans*, 966 F.2d 398 (8th Cir. 1992), where the court held officers executing a search warrant for drugs acted lawfully when they looked inside a box in a closet and found incriminating photographs. In particular, the Government points to the following holding by the *Evans* court:

> The search warrant for Bruce Evans's house authorized the police to seize, among other things, drugs and drug paraphernalia, either of which could have been stored in a box in a closet. The police were, therefore, acting within the scope of the warrant when they opened the box containing the photos. Moreover, the incriminating nature of the photos picturing Bruce Evans with large quantities of marijuana must have been immediately apparent to the officer who opened the box. The photographs were, therefore, lawfully seized and admissible at trial.

*Evans*, 966 F.2d at 400. The Government argues the incriminating nature of the photographs in the present case would have been apparent immediately. Doc. No. 16-1, p. 16.

The court finds that based on the evidence the officers had at the time of McManaman's arrest, a search warrant could have been issued, and it would have allowed officers to search for guns and ammunition, drugs, and drug paraphernalia, any of which could have been stored in boxes in a closet. It would have been reasonable for the officers to rifle through the boxes' contents during their search, which would have led inevitably

11

to discovery of the incriminating photographs.[3] The incriminating nature of the photographs was immediately apparent; at least some of them appear to depict underage females, *see* Gov't Exs. 20-23. *See* Gov't Ex. 20. The court therefore finds the photographs inevitably would have been discovered, and they need not be suppressed. As such, McManaman's subsequent admissions about the pornographic materials also are not subject to suppression.

McManaman also argues Frye never consented to any search of the residence, or if she did consent, she did so under duress and her consent was involuntary. He further argues that even if she gave such consent, she lacked the authority to do so because the house is owned by his mother. Frye did not have access to the locked room or the locked closet, and she had no authority to consent to a search of the room or the closet. Doc. No. 30-1, pp. 74-75. Although the court does not need to reach the consent issue given the above finding that the items inevitably would have been discovered, the court finds Frye consented to Dodds's entry into the locked room, and to Monney's entry into the locked closet. The court further finds Frye asked Monney to remove the pornographic materials from the residence, and it was only in hindsight that she changed her mind about consenting to the search of the residence.

The court also finds Frye had either actual or apparent authority to consent to a search of the entire residence. *See United States v. Matlock*, 415 U.S. 164, 169 n.2 n.4, 94 S. Ct. 998, 993, 39 L. Ed. 2d 242 (1974) ("[W]here two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either.").

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed

---

[3] Furthermore, if the photographs were, in fact, folded as McManaman implied at the hearing, then the officers would have had reason to unfold the documents to determine whether they contained drugs, which often are contained within folded pieces of paper.

12

> to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

*Georgia v. Randolph*, 547 U.S. 103, 106, 126 S. Ct. 1515, 1518, 164 L. Ed. 2d 208 (2006). "[T]he exception [to the Fourth Amendment rule that ordinarily prohibits warrantless entry into a person's residence as unreasonable *per se*] for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant[.]" *Randolph*, 547 U.S. at 109, 126 S. Ct. at 1520 (citing *Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2793); *see United States v. Hilliard*, 490 F.3d 635 (8th Cir. 2007) (citing *Rodriguez*).

Frye was a co-occupant of the residence. She quickly and easily opened the locked room with a knife, stating they often entered the room with a screw driver when the door locked accidentally. Although she did not possess a key to the locked closet, she indicated she did not object to Monney's search of the closet, and she further offered no objection when he removed the closet door. The court finds the officers reasonably believed she possessed shared authority over the entire house.

McManaman raises one additional issue in his motion. Although the court found previously that the officers' questioning of McManaman before the *Miranda* warnings were administered violated his Sixth Amendment right to counsel, *see* Doc. No. 39 in the prior case, pp. 6-8, McManaman argues the question about whether there was anything illegal in the house also violated his Fifth Amendment rights, with the result that any evidence flowing from his response to the question must be suppressed as fruit of the poisonous tree. *See* Doc. No. 30-1, pp. 80-81; Doc. No. 29, p-p. 3-5. McManaman asks the court to find that his response to the question was involuntary. *Id.*

Ths issue of whether McManaman's statement regarding the shotgun in the house was voluntary or involuntary is rendered moot by the court's finding that the incriminating materials inevitably would have been discovered. Even assuming *arguendo* that McManaman's statement was involuntary, the court previously has ruled that the officers would have applied for a search warrant, probable cause existed, and a neutral magistrate would have issued the warrant. During execution of a search warrant, the incriminating items inevitably would have been discovered. The court, therefore, does not need to reach the issue of whether McManaman's pre-*Miranda* statement was involuntary.

For these reasons, the undersigned respectfully recommends that McManaman's motion to suppress be denied. Objections to this Report and Recommendation must be filed by **September 21, 2010**. Responses to objections must be filed by **September 28, 2010**.

**IT IS SO ORDERED.**

**DATED** this 15th day of September, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT