**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

KEVIN McMANAMAN,

        Defendant.

No. CR10-4024-MWB

**ORDER REGARDING
MAGISTRATE'S AMENDED
REPORT AND RECOMMENDATION
CONCERNING DEFENDANT'S
MOTION TO SUPPRESS**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *B. Objections To Report and Recommendation* . . . . . . . . . . . . . . . . . . 15
       *1. Application of the doctrine of collateral estoppel* . . . . . . . . 15
       *2. Inevitable discovery of child pornography evidence* . . . . . . . 17
       *3. Alleged Fifth and Sixth Amendment violations* . . . . . . . . . . 20
          *a. alleged Sixth Amendment violation* . . . . . . . . . . . . . 21
          *b. alleged Fifth Amendment violation* . . . . . . . . . . . . . 25
       *4. Frye's consent to search* . . . . . . . . . . . . . . . . . . . . . . . . 26
          *a. consent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          *b. actual or apparent authority to consent* . . . . . . . . . . 27

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# I.  INTRODUCTION AND BACKGROUND

## A.  Procedural Background

On May 21, 2010, an indictment was returned against defendant Kevin McManaman charging him with production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), transportation of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and 2252A(b)(1), and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).  On July 23, 2010, defendant McManaman filed a motion to suppress evidence in which he seeks to suppress statements made after his arrest as well as a evidence recovered from his home.  Defendant McManaman argues that the evidence was found during a warrantless search of his residence, in violation of the Fourth Amendment of the United States Constitution. Defendant McManaman also argues that any statements made by him should be suppressed because they were obtained in violation of his Fifth And Sixth Amendment rights and were involuntary.  The prosecution filed a timely resistance to defendant McManaman's motion.  Defendant McManaman's motion to suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b).  On August 17, 2010, Judge Zoss conducted an evidentiary hearing.  On September 14, 2010, Judge Zoss filed a Report and Recommendation in which he recommends that defendant McManaman's motion to suppress be  denied.  On September 15, 2010, Judge Zoss filed an Amended  Report and Recommendation in which he again recommends that defendant McManaman's motion to suppress be denied.[1]

---

[1]The Amended Report and Recommendation corrected the dates for the parties to file objections.

In his Amended Report and Recommendation, Judge Zoss notes that the search at issue in the present case had previously been the subject of a motion to suppress in *United States v. McManaman*, CR08-4025-MWB ("the '08 case"), which the court had granted in part and denied in part. In the '08 case, in which McManaman was charged with drug and firearm offenses, McManaman moved to suppress statements he made shortly following his arrest, and a shotgun that was found during a warrantless search of his residence. Judge Zoss recommended that McManaman's motion to suppress in the '08 case be granted in part and denied in part. Judge Zoss found that McManaman's statements to law enforcement officers immediately following his arrest, but before *Miranda* warnings were administered, violated McManaman's Sixth Amendment right to counsel and should be suppressed. Judge Zoss, however, further found that a shotgun seized by officers from McManaman's home did not need to be suppressed because it inevitably would have been discovered. The court accepted Judge Zoss's Report and Recommendation and denied in part and granted in part McManaman's Motion to Suppress in the '08 case. As a result of the court's determination in the '08 case, Judge Zoss found in his Amended Report and Recommendation that the rule of collateral estoppel applied in this case, and concluded that McManaman is estopped from relitigating the issue of probable cause and inevitable discovery of the shotgun, but not from litigating the issue of inevitable discovery of the alleged child pornography. On that issue, Judge Zoss found, based on the evidence the law enforcement officers had at the time of McManaman's arrest, a search warrant could have been issued which would have allowed the officers to search for guns and ammunition, drugs, and drug paraphernalia, and the ensuing search would have led inevitably to discovery of the incriminating photographs which appear to depict underage females. In addition, Judge Zoss concluded that McManaman's wife consented to a search of a locked room and a locked closet in the house they shared and

that McManaman's wife had either actual or apparent authority to consent to a search of the entire residence. Therefore, Judge Zoss recommended that defendant McManaman's Motion to Suppress be denied. Defendant McManaman has filed objections to Judge Zoss's Report and Recommendation. The prosecution has not filed a timely response to defendant McManaman's objections. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant McManaman's Motion to Suppress.

## B. Factual Background

In his Amended Report and Recommendation, Judge Zoss noted that his Report and Recommendation in the '08 case contained the following factual background:

> "Sometime before September 2005, law enforcement officers received information that McManaman was involved in trading firearms for drugs. An Amber Christianson told officers she had asked McManaman if he had any guns, and McManaman responded he had two guns in his house that he wanted to get rid of because he was a convicted felon. He told Amber he wanted to exchange the guns for some methamphetamine. When he delivered the guns to Amber, he told her he had gotten the guns from Justin Watterson, who had stolen them from Watterson's grandfather's home. McManaman also told Amber he was with Watterson when the guns were stolen.
>
> Officers interviewed McManaman on or about September 29, 2005, and he signed an affidavit in which he admitted he was a convicted felon and he was in possession of some firearms. Officers interviewed McManaman again on or about November 7, 2005, and at that time, he admitted that he had traded a gun for some drugs. He also told the officers he had disposed of a couple more firearms since his September 2005 interview. Later, officers talked with McManaman again, but the record does not indicate when or how many

times.  The last contact officers had with McManaman before his indictment on the current charges (which occurred on March 25, 2008) was on May 18, 2006.

On April 2, 2008, about a week after McManaman was indicted, Agents Monney and Dodds met with officers from several other agencies for a briefing in preparation for McManaman's arrest on the federal arrest warrant issued in connection with his indictment.  Officers involved in the briefing included two agents from Immigration and Customs Enforcement, Deputy U.S. Marshal Peter Zellmer, and three officers from the Sioux City Police Department, one of whom was an officer with the Gang Unit.  Agent Dodds testified McManaman was not suspected of any gang-related activities or immigration violations, and all of the officers present besides himself and Agent Monney were present for purposes of officer safety.  Dodds acknowledged that McManaman had never been threatening or caused problems when officers had spoken with him previously, but the officers were aware that McManaman had a "history of violence" and numerous prior convictions, one of which was a "hate crime."

The officers proceeded to McManaman's residence at approximately 9:00 p.m. on April 2, 2008.  They drove past the house but it appeared no one was home.  They placed the house under surveillance and headed toward McManaman's mother's residence, thinking he might be there, but before they arrived, the officer watching McManaman's residence called to say McManaman had returned to his residence.

The officers returned to the McManaman residence and took up positions surrounding the house, covering all available exits.  Agents Monney and Dodds approached the front door with Deputy Marshal Zellmer and a "breaching tool," which they planned to use if the home's occupants refused to open the door.  Agent Monney knocked on the door and McManaman came to the door.  When McManaman opened the door, the officers on the porch could see that there were several children in the house, appearing to range in age from a toddler to a teenager.  They also could see a great deal of trash in the

house and "stuff everywhere." McManaman's wife, Tina Frye, also came to the door.

Agent Monney asked McManaman if he would step out onto the porch. The officers wanted to avoid placing McManaman under arrest in front of the children, if possible. McManaman complied, and Frye stepped into the doorway. Monney informed McManaman that he had been indicted and they had a warrant for his arrest. He went behind McManaman and began patting him down for weapons. During the pat-down, Monney found a marijuana pipe, a methamphetamine pipe, and a "snort tube" in McManaman's pockets.

The witnesses' hearing testimony differs on the events that occurred on the porch. Agent Dodds testified that while McManaman was being handcuffed, Dodds asked him if there was anything illegal inside the home that the officers should be concerned about. Dodds testified it is his experience that when people are carrying drug paraphernalia, they are likely to have drugs nearby. Based on McManaman's history, they also feared there might be firearms in the house. According to Dodds, McManaman responded to the question by pausing briefly, sighing, and then stating there was a broken-down shotgun in his basement that had belonged to his grandfather. McManaman asked the officers if Frye could retrieve the shotgun, but the officers stated one of them would have to accompany Frye into the house to get the firearm. McManaman told Frye where the shotgun was located. Frye came out on the porch, closed the front door, and then led Dodds around to a door at the back of the house. She opened the door and led Dodds and another officer to the basement, where they retrieved the shotgun.

McManaman first testified that when Dodds asked him the question about whether there was anything illegal in the house, he paused briefly, and then stated there was a shotgun in the basement. He told the officers that the shotgun was broken down into pieces and stored where his children could not get to it. He asked if his wife could retrieve the gun, and,

according to McManaman, one of the officers told him they either could send one officer into the house with Frye to retrieve the shotgun, or they would have to bring in a dog and search the house. Later, he changed his testimony, and stated that the officer's comment about bringing in a dog to search the house came earlier in the events. In this version, after Dodds asked McManaman the question about whether there was anything illegal in the house, McManaman paused briefly, but before he could answer further, either Monney or Dodds stated if he did not cooperate and tell them about anything illegal that was in the house, they would send a dog through the house. McManaman also testified that as he was being patted down and handcuffed, one of the officers on the porch asked him, "Where's the methamphetamine?" Agents Monney and Dodds both testified on rebuttal that no statements were made during McManaman's arrest concerning bringing a dog into the house. Deputy Marshal Zellmer, who also was on the porch during the arrest, testified he did not hear any statements about a dog.

The officers and McManaman agree that after McManaman stated there was a firearm in the house, Frye led Dodds around the house, opened the door, and Dodds and another officer followed her to the basement to retrieve the firearm. The entire exchange, from the time McManaman was taken into custody until his wife led Dodds around the side of the house, took no more than five minutes. The parties also agree that after his arrest, McManaman was taken to the Woodbury County jail, where he was advised of his rights and then questioned in detail about the allegations in the indictment. During this questioning, he made certain admissions.

Substantial additional testimony was elicited at the hearing concerning whether, and when, Frye may have consented to a search of the residence; what other actions officers took inside the residence when they went in to retrieve the shotgun; and what officers discovered in a subsequent

search of the residence. None of these facts are relevant to consideration of McManaman's current motion to suppress."

Amended Report and Recommendation at 2-5 (quoting Report and Recommendation, docket no. 39, in the '08 case at 2-5).

Judge Zoss made the following findings of fact in his Amended Report and Recommendation concerning the discovery of the alleged child pornography:

> Agent Zane Dodds entered the residence following McManaman's arrest to retrieve the shotgun. As Tina Frye led him through the house, they encountered a locked door. Dodds claims Frye consented to the officers' search of the locked room. According to Dodds, Frye stated the door must have been locked accidentally and they usually used a screwdriver to get into the room. Another agent who was present with Dodds and Frye had a pocket knife, and using the knife, Frye quickly opened the locked door. Doc. No. 30-1, p. 74; Gov't Ex. 19, pp. 116-17. Dodds did not search the room himself; instead, Monney entered the residence to look inside the room. *Id.*, p. 117. Inside the locked room, Monney encountered a closet that was locked with a padlock. According to Monney, Frye stated she did not have a key to the padlock, but she gave him permission to open the closet door. Monney removed the door's hinge pins to open the door. Doc. No. 30-1, p. 6. Frye denies that she consented to any search of the residence. Gov't Ex. 19, pp. 92, 95-96, 101.
>
> When the closet door was removed, Monney observed some boxes, stacks of magazines, and videotapes. *See, e.g.*, Gov't Exs. 2 & 3, photographs of the interior of the closet. Monney proceeded to look through the closet's contents, including opening boxes and rifling through a stack of magazines. Inside one box, mixed in among some magazines, Monney found several color photographs depicting young nude females. The photographs bore text at the bottom that

appeared to be an Internet address. *See* Gov't Exs. 20-25. Defense counsel objected to Monney's characterization of the individuals in the photographs as "young." The court found at the hearing that "after viewing those pictures, [the officers] were reasonable in believing that they had observed child pornography . . . and, if it came into their plain view, that that would justify their further investigation of that issue." Doc. No. 30-1, pp. 76-77. At least four of the individuals in the photographs appear to be underage. *See* Gov't Exs. 20-23.

Monney also found a videotape bearing a handwritten label on which was written a name that Monney knew to be the same as McManaman's minor daughter's name, followed by "Home XXX Edit," and a date. *See* Gov't Ex. 14. Monney testified that when he asked Frye about the items in the closet, Frye "said that she knew that there were some pornographic material in the closet," and she asked him "to get rid of it all . . . to take it." Doc. No. 30-1, p. 30. Monney removed the videotapes and printed materials from the closet. Officers later questioned McManaman about the materials, and he made certain admissions regarding the materials.

Frye testified at both of the suppression hearings. She denied that she gave consent to the officers to do anything other than accompany her into the house to retrieve the shotgun, and she further stated she never explicitly gave them permission even to do that; rather, they followed her into the house when she entered to retrieve the shotgun. *See* Gov't Ex. 19, pp. 92, 95-96. She stated that after the items were removed from the closet, the officers presented her with both a consent-to-search form and a form authorizing them to take the videotapes, but she refused to sign either form, and stated she had never consented to their search of the house. Gov't Ex. 19, pp. 95-96, 124-25. Dodds testified that Frye led him through the house, and each time they passed a room, he asked if he could look into it and she consented. Gov't Ex. 19, pp. 116-18. Monney testified that Frye never objected as she led

agents through the house or during the search, and she gave him permission to open the locked closet. Doc. No. 30-1, pp. 6-7, 32. After Monney discovered the pornographic material and alleged child pornography in the closet, Frye asked him to remove the pornographic materials from the residence. *Id.*, p. 30; *see id.*, p. 31.

Amended Report and Recommendation at 8-10 (footnote omitted). Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

### A. Standard Of Review

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the

> district judge, *sua sponte* or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit

Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the

advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy

itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[2]

---

[2] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report

(continued...)

14

As noted above, defendant McManaman has filed objections to Judge Zoss's Amended Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant McManaman's Motion to Suppress.

## B. Objections To Report and Recommendation

### 1. Application of the doctrine of collateral estoppel

Defendant McManaman initially objects to Judge Zoss's conclusion that the collateral estoppel rule applies to criminal defendants such as him in this case. Collateral estoppel is part of the broader principle of res judicata, and generally bars relitigation of any issue which was actually determined in a prior action between the same parties. *See Ashe v. Swenson,* 397 U.S. 436, 443 (1970); *see also Montana v. United States*, 440 U.S. 147, 152 (1979); *Oldham v. Pritchett*, 599 F.2d 274, 278 (8th Cir. 1979); *United States v. Smith*, 482 F.2d 1120, 1123 n.9 (8th Cir. 1973).

Originally developed in civil cases, collateral estoppel has been recognized by the Eighth Circuit Court of Appeals to apply in criminal cases against a criminal defendant.

---

[2](…continued)
and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

*See United States v. Rosenberger*, 872 F.2d 240, 242 (8th Cir. 1989) (holding that defendant was collaterally estopped from moving to suppress evidence previously found to be legally obtained and noting that "[w]e agree that courts should more closely examine the prerequisites of the estoppel doctrine in the context of criminal cases, but we find no reason in this case for avoiding the doctrine's application.")(citation omitted); *see also United States v. Torres-Villalobos*, 487 F.3d 607, 617 (8th Cir. 2007) (noting that "'the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.'") (quoting *Hernandez-Uribe v. United States,* 515 F.2d 20, 22 (8th Cir. 1975)); Richard B. Kennelly, Jr., *Precluding the Accused: Offensive Collateral Estoppel in Criminal Cases*, 80 VA. L. REV. 1379, 1386 (1994) ("Invoking collateral estoppel against the accused is more easily justified regarding suppression motions than regarding a substantive element of the offense.")).  While acknowledging the Eighth Circuit Court of Appeals's holding in *Rosenberger* and its progeny, McManaman argues that the court should decline to follow this line of authority and, instead follow the Eleventh Circuit Court of Appeals's decision in *United States v. Harnage*, 976 F.2d 633 (11th Cir. 1993), in which that court held "the government may not collaterally estop a criminal defendant from relitigating an issue decided against the defendant in a different court in a prior proceeding."  *Id.* at 636.; *see also United States v. Martin,* 169 F. Supp. 2d 558, 562-63 (E.D. La. 2001) (declining to apply collateral estoppel to bar defendant's motion to suppress).  The hitch in McManaman's argument is that the court is not free to follow the Eleventh Circuit Court of Appeals's *Harnage* decision.  Rather, the court is bound to apply controlling Eighth Circuit precedent here, *Rosenberger* and its progeny.  *See Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003) (noting that a district court "is bound, as are we, to apply the precedent of this Circuit."); *Okruhlik v. University of Ark. Ex rel. May,* 255 F.3d 615, 622

(8th Cir. 2001) (finding court must follow controlling precedent and only the Eighth Circuit Court of Appeals sitting *en banc* can overrule controlling circuit precedence). The court, therefore, overrules this objection to Judge Zoss's Amended Report and Recommendation.

### 2. *Inevitable discovery of child pornography evidence*

Defendant McManaman also objects to Judge Zoss's finding that the evidence of the alleged child pornography found in his residence was admissible under the inevitable discovery doctrine. Judge Zoss found that while McManaman is estopped from relitigating the issues of probable cause and inevitable discovery of the shotgun, the issue of inevitable discovery of the alleged child pornography was not previously litigated in the '08 case. Judge Zoss further concluded that, based on the finding in the '08 case that a search warrant could have been issued for McManaman's residence which would have permitted the officers to search for guns and ammunition, drugs, and drug paraphernalia, it would have been reasonable for the officers to look through boxes in a closet during their search, and, in doing so, the officers would inevitably have come across the alleged photographs of child pornography, the incriminating nature of which was immediately apparent since at least some of photographs appear to depict minor females. *See* Gov't Exs. 20-23. Thus, Judge Zoss concluded the photographs inevitably would have been discovered, and they need not be suppressed.

In *Nix v. Williams*, 467 U.S. 431 (1984), the United States Supreme Court adopted the inevitable discovery doctrine as an exception to the exclusionary rule. The Court held that where evidence is discovered after "illegal government activity", the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id*. at 444. The Court explained that the rationale underlying the inevitable

discovery exception is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id*. at 443.

Under Eighth Circuit Court of Appeals's precedent, to prevail under this exception, the prosecution must establish "'(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'" *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)); *accord United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008); *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003); *United States v. Villalba-Alvardo*, 345 F.3d 1007, 1019 (8th Cir. 2003); *United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003); *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999). In applying the inevitable discovery doctrine, the Eighth Circuit Court of Appeals has noted that "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." *Villalba-Alvardo*, 345 F.3d at 1019; *see also United States v. Feldhacker*, 849 F.2d 293, 296 (8th Cir. 1988) ("The difficulty with appellants' approach to the inevitable-discovery rule is that it mistakenly focuses on what investigators actually did after the unlawful discovery, rather than what they would have done in the absence of such an illegal disclosure. This inquiry necessarily entails reasoning about hypothetical circumstances contrary to fact.").

In the '08 case, the court concluded that the prosecution had satisfied both prongs of the inevitable discovery doctrine with respect to the discovery of the shotgun found in

McManaman's residence. McManaman is collaterally estopped from contesting that finding in this case. As a result, the finding in the '08 case, that a search warrant could have been issued for McManaman's residence which would have permitted the officers to search for guns and ammunition, drugs, and drug paraphernalia, is conclusively established here. A warrant to search a house authorizes the police to search any closet, container, or other closed compartment in the building that is large enough to contain the contraband or evidence that they are looking for. *See United States v. Ross,* 456 U.S. 798, 820-21 (1982); *see also United States v. Hughes*, 940 F.2d 1125, 1127 (8th Cir. 1991) ("A lawful search extends to all areas and containers in which the object of the search may be found."). As the Supreme Court explained in *Ross*:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Ross*, 456 U.S. at 821. Thus, here, because the officers would have been authorized to search for guns and ammunition, drugs, and drug paraphernalia, in McManaman's

residence, they could search any container large enough to hold a gram, or less, of drugs. Accordingly, the officers would have been acting within the scope of the search warrant when they examined the box containing the photos. *See United States v. Evans*, 966 F.2d 398, 400 (8th Cir. 1992) (holding that law enforcement officers executing a search warrant for drugs acted lawfully when they looked inside a box in a closet and found incriminating photographs).

Under the "plain view" exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010); *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007); *United States v. Bustos-Torres*, 396 F.3d 935, 944 (8th Cir. 2005). Here, because at least some of the photographs appear to be nude photographs of minor females, the incriminating nature of the photographs was immediately apparent to the officers and they were permitted to seize them without a warrant under the plain view exception. *See Dickerson*, 508 U.S. at 375; *Muhammad*, 604 F.3d at 1027. Accordingly, the court agrees with Judge Zoss's conclusion that the photographs inevitably would have been discovered, and they need not be suppressed. The court, therefore, overrules this objection to Judge Zoss's Amended Report and Recommendation.

### 3. *Alleged Fifth and Sixth Amendment violations*

Defendant McManaman next objects to Judge Zoss's finding that because the inevitable discovery doctrine validates the results of the search of McManaman's house, the court need not reach the issue of whether the evidence seized from McManaman's house constitutes tainted "fruit" derived from McManaman's unconstitutional pre-*Miranda* questioning. McManaman argues that Agent Dodds violated both McManaman's Fifth and

Sixth Amendment rights by asking him if there was anything illegal inside his home before advising McManaman of his *Miranda* rights. McManaman further argues all evidence found during the subsequent search of his home should be suppressed as the fruit of this questioning.[3] Judge Zoss concluded that it was unnecessary to address McManaman's contention on this point because the evidence inevitably would have been discovered. Although the court agrees with Judge Zoss's conclusion, the court will, nevertheless, address the merits of McManaman's argument.

### a. *alleged Sixth Amendment violation*

McManaman argues that, based on the court's suppression order in the '08 case, the prosecution is collaterally estopped from contesting his assertion that the officers' violated his Sixth Amendment rights when they questioned him after his arrest. The prosecution counters that collateral estoppel does not apply to the Sixth Amendment issue in this case because the Sixth Amendment issue in controversy here is not identical to the one decided in the '08 case.

Under the doctrine of collateral estoppel or issue preclusion, five criteria must be met before a determination is conclusive in a subsequent proceeding:

> "(1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the

---

[3]The Supreme Court first articulated the "fruit-of-the-poisonous-tree" doctrine in *Wong Sun v. United States,* 371 U.S. 471 (1963). In *Wong Sun,* the Court held that evidence and witnesses discovered as a result of an illegal search are "tainted" and must be excluded. *Id.* at 487-88.

> determination in the prior action must have been essential to
> the prior judgment."

*Ginters v. Frazier*, 614 F.3d 822, 826 (8th Cir. 2010) (quoting *Robinette v. Jones,* 476 F.3d 585, 589 (8th Cir. 2007) (quoting in turn *Anderson v. Genuine Parts Co., Inc.,* 128 F.3d 1267, 1273 (8th Cir. 1997)); *see B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 1069 (2010); *Olsen v. Mukasey*, 541 F.3d 827, 831 (8th Cir. 2008), *cert denied sub nom. Olsen v. Holder*, 129 S. Ct. 2178 (2009); *see also Irving v. Dormire*, 586 F.3d 645, 648 (8th Cir. 2009) (setting out a near identical four-factor test but without the requirement that the party sought to be precluded in the second suit was a party, or in privity with a party, to the original lawsuit); *Ripplin Shoals Land Co. v. United States Army Corps of Eng'rs,* 440 F.3d 1038, 1044 (8th Cir. 2006) (same four factor test applied).

As noted above, the prosecution contends that collateral estoppel does not apply to the Sixth Amendment issue before the court in this case because the Sixth Amendment issue in controversy here is not identical to the one decided in the '08 case. For collateral estoppel to preclude an issue, the issue must be identical to the issue previously decided. *Ginters*, 614 F.3d at 826; *Irving*, 586 F.3d at 648; *Hargis Indus., Inc.*, 569 F.3d at 387; *Olsen*, 541 F.3d at 831. McManaman, as the party seeking collateral estoppel, has the burden "'to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.'" *Irving*, 586 F.3d at 648 (quoting *Dowling v. United States,* 493 U.S. 342, 350 (1990)).

The issue here is controlled by the United States Supreme Court's decision in *Texas v. Cobb,* 532 U.S. 162 (2001). In *Cobb*, the defendant, while under arrest for an unrelated offense, initially admitted that he had committed a residential burglary but denied having any knowledge of the disappearance of two residents of the burglarized home. *Id*. at 165.

Based on his confession, the state indicted the defendant for burglary. The defendant was then appointed counsel and released on bond. *See id.* More than a year later, while awaiting trial on the burglary offense, the defendant's father informed the police that the defendant had admitted to killing one of the missing persons during the burglary. *Id.* After the police took the defendant into custody and advised him of his *Miranda* rights, he waived his rights and confessed to murdering both of the missing persons-all in the absence of his appointed counsel. *Id.* The defendant was convicted of capital murder and sentenced to death. *Id.* at 166. The defendant appealed, arguing, *inter alia,* that his confession should have been suppressed because it was obtained in violation of his Sixth Amendment right to counsel. *Id.* The defendant asserted that his Sixth Amendment right to counsel attached when counsel was appointed for him in his burglary case. The Texas Court of Criminal Appeals reversed the conviction, holding that the Sixth Amendment right to counsel attaches to uncharged offenses that are "'very closely related factually'" to charged offenses. *Id.* at 167. Finding the uncharged capital murder offense was "'factually interwoven with the burglary,'" the Texas court concluded that the defendant's Sixth Amendment right to counsel had attached with respect to the murder offense at the time of his confession. *Id.* The Texas court, therefore, held that the defendant's confession was obtained in violation of his Sixth Amendment right to counsel and was inadmissible in his capital murder trial. *See id.* The United States Supreme Court granted certiorari and reversed. The Court held that the Sixth Amendment right to counsel does not extend to uncharged offenses, even if they are "closely related to" or "inextricably intertwined with" charged offenses. *Id.* at 172 (internal quotation marks omitted). The Court emphasized that the Sixth Amendment right to counsel is "offense specific" and "attaches only to charged offenses." *Id.* However, the Court also concluded that the Sixth Amendment right to counsel does extend to offenses that, even if not formally charged,

would be considered the "same offense" under the "*Blockburger* test" established in *Blockburger v. United States,* 284 U.S. 299 (1932). *Id.* at 173.

In the '08 case, in an indictment returned on March 26, 2008, McManaman was charged with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2, distribution and attempted distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846, using and aiding and abetting the use of firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(1), possession of stolen firearms, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2), transportation of stolen firearms, in violation of 18 U.S.C. §§ 922(l) and 924(a)(2), and being a convicted felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). McManaman was not indicted on the present charges until May 21, 2010. More important, the present charges are not the same as those in the '08 case nor can the child pornography charges here be considered the "same offense" under the *Blockburger* test as any of the gun and drug charges found in the '08 case since the child pornography offenses here all require proof of a fact which the gun and drug offenses do not. *Blockburger*, 284 U.S. at 304.

Thus, the court concludes that because McManaman's Sixth Amendment right to counsel for the current charges had not attached at the time of his questioning in 2008, the Sixth Amendment violation established in the '08 case is not the same as the issue involved in this case. Accordingly, the court concludes that the prosecution is not collaterally estopped from contesting McManaman's assertion that the officers' violated his Sixth Amendment rights when they questioned him immediately after his arrest. Moreover, since McManaman's Sixth Amendment right to counsel for the current charges had not attached at the time of his questioning in 2008, the Sixth Amendment right to counsel did

not bar the officers from questioning McManaman in regard to the current offenses. The court, therefore, also overrules this objection to Judge Zoss's Report and Recommendation.

### b.    alleged Fifth Amendment violation

McManaman also argues that all evidence found during the search of his home should be suppressed as the fruit of questioning that was obtained without his having been informed of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). McManaman's argument is foreclosed by the United States Supreme Court's decision in *United States v. Patane,* 542 U.S. 630 (2004). In *Patane*, the Court held that non-testimonial evidence obtained as a result of incriminating statements made in violation of *Miranda* are admissible in the prosecution's case, provided the statements are made voluntarily, and are not the result of coercion. *Id.* at 634. The Court's reasoning for its decision is the "fruit of the poisonous tree" doctrine only applies if there has been a constitutional violation, and the Court has recognized that the mere failure to administer *Miranda* warnings, as long as the statements were made voluntarily, does not give rise to a constitutional violation. *Id.* at 639.

McManaman argues that *Patane* is not controlling here because his statement to the officers was coerced. The prosecution bears the burden of showing, by a preponderance of the evidence, that McManaman's statement was made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The record here, however, belies McManaman's assertion. A claim of involuntariness may be sustained only upon a showing that coercive police conduct overbore the exercise of the defendant's free will. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). Although McManaman claims that law enforcement officers threatened to bring a dog to search the house, his testimony on this point was disputed by three law enforcement officers who all

testified that they heard no mention of a dog being brought to search the house. On this point, the court accepts the testimony of the officers, which the court finds to be consistent, coherent and plausible. The court does not find McManaman to be a credible witness on this point. Aside from his obvious interest in the outcome of this motion, he is also a convicted felon. Thus, the court concludes that law enforcement authorities did not use coercion in eliciting his initial statement and that McManaman's statement was made voluntarily. Accordingly, because McManaman's initial statement to the officers was made voluntarily, and was not the result of coercion, the "fruit of the poisonous tree" doctrine does not apply to physical evidence seized as a result of the *Miranda* violation here. *See Patane,* 542 U.S. at 634. The court, therefore, also overrules this objection to Judge Zoss's Report and Recommendation.

### 4. *Frye's consent to search*

Defendant McManaman also objects to Judge Zoss's findings that Tina Frye consented to the search of the basement closet, and that she had actual or apparent authority to consent to the search. The court concludes from its review of the record that both of Judge Zoss's findings are correct.

### a. *consent*

The difficulty posed by the issue of whether Frye consented to a search of her and McManaman's home lies in the divergent testimony presented at the suppression hearings in this and the '08 case. Frye testified that she never consented to a search of her home. Hearing tr. at 92, 122, 123, docket no. 27-9. In contrast, Agent Dodd testified that after McManaman told the officers about the shotgun in his house and instructed Frye to take the officers to the firearm, she led the officers into the house to search for the shotgun. Hearing tr. at 19-20, docket no. 27-9. Agent Monney's testimony was consistent with Agent Dodd's testimony. Hearing tr. 32, 38, docket no. 30. The court concludes from

its de novo review of the record that Frye consented to the search of her home. Several facts lead the court to this conclusion. First, at no time during the search of the house did Frye object to the search. Rather than protest, Frye went out of her way to aid the officers in their search. This is best exemplified by Frye's actions when the officers came across the locked room. Frye told the officers that the door must have been locked accidentally and they usually used a screwdriver to get into the room. She then asked if the officers had a knife. Another officer who was present with Agent Dodds, gave Frye his pocket knife, and Frye quickly opened the locked door using the officer's knife. The court also finds the recorded encounter the officers had with Frye before their second search of the property to be telling. *See* Gov't Ex. 17. In this recording, the officers ask Frye if she will again consent to a search of her house, this time for a computer purportedly containing child pornography. Although not obligated to do so, the officers advised Frye of her right to refuse to consent. *See Schneckloth*, 412 U.S. at 248-49. In response, Frye does not state or otherwise protest that she never consented to the first search. Instead, she asks the officers if she can go into the house and bring the computer to them. When the officers respond by telling her that they need to look for themselves, Frye asks what will happen if she refuses their request to search. The officers inform Frye that she has the right to refuse to consent but in that event they would seek a search warrant. At this juncture, Frye consents to the second search. The recording is particularly instructive because Frye sounds at ease with the officers and willing to be cooperative with their efforts. Thus, the court concludes that Frye consented to the search of the house. Accordingly, this objection is also overruled.

### b. *actual or apparent authority to consent*

The court turns next to consider whether Frye had actual or apparent authority to consent to a search of the house. The prosecution has the burden of proving authority to

consent by a preponderance of the evidence. *Illinois v. Rodriguez,* 497 U.S. 177, 181(1990). The consent of a third party to a search of common premises is effectual if the third party has either the actual authority or the apparent authority to consent to a search. *See Rodriguez,* 497 U.S. at 188. Whether or not a third party has the actual authority to grant entry to law enforcement officers is determined by the test articulated in *United States v. Matlock*, 415 U.S. 164 (1974). The test is whether the third party has "mutual use of the property[,] . . . generally ha[s] joint access or control for most purposes [,] . . . and [whether] the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock,* 415 U.S. at 171 n. 7. Accordingly, common-authority rights under the Fourth Amendment can be broader than the rights that property law provides. As the Supreme Court has reasoned:

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock,* 415 U.S. at 171 n.7 (internal citations omitted)

The Supreme Court's holding in *Rodriguez* also delineates the proper analysis for determining whether a third-party's consent to a search is valid under the "apparent authority" exception. *Rodriguez,* 497 U.S. at 186-88. In *Rodriguez*, the Court held that the Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent to this entry. *See id.* at 185-89. The determination of the

reasonableness of the officers' belief is an objective one: "'Apparent authority is present when 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over'' the thing searched." *United States v. Munoz*, 590 F.3d 916, 922 (8th Cir. 2010) (quoting *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009) (quoting in turn *Rodriguez*, 497 U.S. at 188).

Here, McManaman asserts that Frye did not have either actual or apparent authority to consent to a search of the closet and points to both Frye and McManaman's testimony that Frye did not have access to the closet. The court, however, concludes that Frye had apparent authority to consent to a search of the closet. Frye is McManaman's wife and lived with him and their children in the house at the time of the search. *See United States v. Denberg,* 212 F.3d 987, 991 (7th Cir. 2000) (having one's children live at a residence suggests authority to consent). Given Frye's long-term and continuing residence at house, she had a sufficient relationship to the house to appear to have authority to permit the search of the entire structure, including the closet. *See Matlock,* 415 U.S. at 171 n.7. Frye's apparent authority is exemplified by the fact that when the officers and Frye came to the locked room with the closet, she quickly and easily opened the locked room with a knife, stating she and McManaman often entered the room with a screwdriver when the door locked accidentally. This demonstrates that Frye had actual authority to access the room containing the closet. While Frye did not possess a key to the locked closet in the room, she told the officers that she did not object to Monney's search of the closet even though it required removing the closet door. Thus, the court concludes that the facts available to the officers at the time of the search would allow a person of reasonable caution to believe that Frye had authority over the entire house, including the basement closet. Accordingly, the court finds that the prosecution has met its burden of

demonstrating Frye's apparent consent to search the basement closet. Accordingly, this objection is also overruled.

### III. CONCLUSION

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Amended Report and Recommendation and **denies** defendant McManaman's Motion to Suppress.

**IT IS SO ORDERED.**

**DATED** this 18th day of October, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA